George H. Dean Co. *v.* Pappas.

GEORGE H. DEAN CO. *vs.* JOHN C. PAPPAS & others.[1]

Suffolk.   December 11, 1981. — January 14, 1982.

Present: BROWN, KASS, & SMITH, JJ.

*Landlord and Tenant,* Covenant to pay taxes.   *Taxation,* Real estate tax.

The base year tax, for purposes of the tax escalator clause of a lease, was the tax as assessed subsequent to an abatement. [57-58]

For the purpose of calculating a lessee's share of increased taxes under a tax escalator clause of a lease, an undifferentiated abatement of the base year taxes was properly allocated between the land and the building thereon in the same proportion as had appeared in the original tax bill. [58-59]

Where the area of leased premises was specified in the lease and the premises were distinguished from other land of the lessor by means of a site plan appended to the lease, the lessee was responsible under the tax escalator clause of the lease only for tax increases allocable to the area referred to in the lease and indicated on the site plan, notwithstanding the fact that a municipal tax bill treating separately the parcel on which the leased premises were located included an additional area of land extending to the center line of adjacent streets not accepted as public ways. [59-60]

Where the consequences of a lessee's failure to pay amounts claimed by a lessor under the tax escalator clause of a lease were potentially grave, and included ejectment and termination of the lease, the lessee's payments of such amounts under protest was not deemed voluntary so as to preclude recovery of overpayments. [60-61]

BILL IN EQUITY filed in the Superior Court on April 4, 1972.

The suit was heard by *Hayeck*, J., a District Court judge sitting under statutory authority.

*James C. Heigham (John N. Garner* with him) for the plaintiff.

---

[1] Thomas A. Pappas, Paul T. Smith, James M. Cazanas and Manuel Katz, all of whom were partners in a real estate venture doing business as "E" Street Associates.

*Robert F. Sylvia* (*Meredith Peterson Tufts* with him) for the defendants.

KASS, J. We are asked to construe the tax escalator provision in a lease.[2]

When they entered into their lease on December 21, 1965, the parties contemplated the construction of a two-story commercial building on a site containing 151,604 square feet of land. The plaintiff, George H. Dean Co. (Dean), was to occupy the entire first floor. An unrelated party occupied the second floor, when it was later completed. Article III of the lease fixed annual rent at $98,000 during the twenty-five year term of the lease and during a five-year extension term should Dean elect to exercise its option for an extension. The land area which the parties allocated to the leased premises was 151,604 square feet.

Article IV, Section I, of the sublease to Dean provides:

> "If the real estate taxes *applicable to the demised premises* for any lease year . . . subsequent to the base lease year . . . shall exceed the real estate taxes . . . for [the] base . . . year . . . [Dean] shall pay to [E Street] the amount of such excess. . . . The real estate taxes assessed against the demised premises for any lease year shall be the product of (i) the amount of real estate taxes assessed against the two-story building for said lease year and (ii) a fraction, the numerator of which is the square footage of the floor area of the demised premises, and the denominator of which is the total square footage of the floor area of the entire office and production building determined as of the commencement of the lease year, apportioned in the first and last year of the term hereof for the portion of such tax years included within said lease years" (emphasis supplied).

---

[2] The lease was in fact a sub-sublease. The owner of the fee was Massachusetts Port Authority, which leased forty-two undeveloped acres to Boston Harbor Industrial Development Corp. That corporation, in turn, entered into a sublease with "E" Street Associates, the defendants.

The base year, by operation of a defining provision in the sublease, is 1967. Taxes allocable to the leased premises were first assessed on a valuation of $200,000 for the building and a valuation of $.492 per square foot of land.[3] The landlord, "E" Street Associates ("E" Street), applied for, and ultimately received, a tax abatement, and, as so abated, the taxes for the base year, by "E" Street's computation, came to $9,050.83. On the basis of the same assumptions as to the allocable land area, the taxes as first assessed (i.e., before abatement) were $15,516.[4]

Differences developed between Dean and "E" Street as to: (1) Whether the base tax should give account to an abatement. (2) How, in any event, the abatement for the base year should be allocated. (3) Whether the area comprising the leased parcel should include land incorporated in certain adjoining streets. (4) Whether Dean could recover amounts already paid to the landlord on account of taxes. A judge of a District Court, sitting in the Superior Court by statutory designation, prepared a careful memorandum declaring the rights of the parties. He determined the first and second issues in favor of "E" Street and the third and fourth issues in favor of Dean. Each party has appealed from the judgment which ensued.

1. *Establishing the base year tax.* The fact of the abatement raises the first issue in the appeal. Are the base year taxes those first assessed or the taxes as assessed after abatement? Obviously the lower base is disadvantageous to the tenant. The question is controlled by *Thorner* v. *Stone,* 357 Mass. 782 (1970), and *Yaffe* v. *S.S. Pierce Co.,* 3 Mass. App. Ct. 792 (1975), which held that the phrase "tax assessed" in a tax escalator clause means the tax as abated. In the lease

---

[3] The tax bill did not, of course, contain a per square foot valuation. But as the parties dispute the land area allocable to the leased premises and the tax bill covered an 18.68 acre parcel (i.e., approximately five times larger than the site of the leased premises) we have computed the per square foot valuations.

[4] Dean's allocation of its share of the original tax bill is $14,743.85, based on an assumption of a smaller amount of the land component of the bill.

before us the parties used the phrase "the real estate taxes applicable" and we are of opinion that this language lends itself even more readily to the interpretation of the tax as abated. We are not persuaded by the distinctions Dean has attempted to draw. If parties intend to base their tax escalator computations on unabated taxes it will be necessary for them to say so unmistakably. Not the least of the merits of that position is that it conforms with economic reality. We can hardly imagine that Dean would be content to pay additional rent on account of increased taxes in subsequent years of the lease term without getting credit for abatements which the landlord might subsequently obtain.

2. *Allocation of the abatement of 1967 taxes.* In their original valuation the assessors assigned $400,000 to land and $200,000 to the building. When the abatement issued, it disclosed a reduction in valuation of $250,000, without allocation between land and buildings. This was in accordance with usual practice; the form (copies of which appear in the record) which certifies real estate tax abatements in Boston contains but one box marked "Value Abated" and there is no place on the form where the value of land and the value of buildings are to be broken out — unlike the case with tax bills. After abatement, the 1967 valuation stood at $350,000.

For purposes of calculating Dean's share of the 1967 taxes, "E" Street carried forward the ratios which had appeared in the original tax bill, i.e., two thirds to land and one third to the building. This resulted in attributing $233,333 to land and $116,667 to the building. By way of criticism of this allocation Dean musters no better argument than speculating that the abatement was based entirely on the undeveloped land. No memoranda to or from the assessors concerning the reasons for the abatement appear in the record to support that hypothesis. An equally cogent theory is that the abatement took into account the unfinished state of the building when it was first assessed on January 1, 1967. In the absence of any persuasive basis for doing otherwise, it was appropriate to allocate the abatement to

land and building in the same proportion as appeared in the original tax bill.[5]

3. *The land area in the leased premises.* It will be recalled that the leased premises are but a portion of an 18.68 acre parcel and that the sublease between "E" Street and Dean defined the land included in the leased premises in terms of a site plan annexed to the lease. By agreement of the parties, the area of the parcel disclosed by the site plan is 151,604 square feet. Not until 1970 did the assessors issue a bill which treated separately with the parcel upon which the leased premises were located. When they did so the assessors included 188,085 square feet in the parcel upon which the building partially occupied by Dean stands. The additional 36,481 square feet are the area between the boundary line of the parcel described in the sublease and the middle lines of two adjacent streets which the city of Boston had not accepted as public ways.

Dean, construing the sublease strictly, says it is responsible for only eighty-one percent of the land taxed. "E" Street takes the position that the additional 36,481 square feet in the abutting streets are an aberration introduced by the assessors which distorts the intention of the parties. It is now "E" Street's turn to speculate about what we ought to infer from the attendant circumstances. The sublease is precise in describing, by plan and by figures, the land area for which Dean is to have partial tax responsibility. No language includes in the leased premises appurtenant rights in general, or in adjoining streets in particular. See *Hampe* v. *Elia,* 251 Mass. 465, 467 (1925). See and compare the discussion appearing in Schwartz, Lease Drafting in Massachusetts § 3.19 (1961), of how to deal with appurtenant rights in a lease. While we acknowledge some force to the argument that, as a matter of economic reality, it is unlikely that the assessors would have ascribed less value to the parcel in question had they measured it only to the lot lines,

---

[5] Ascribing the entire abatement to land would have increased the tax allocable to the leased premises during 1967, the base year.

we think that is insufficient reason to disregard the unam-
biguous text of the lease. Accordingly, we agree with the
trial judge that Dean should be responsible for only eighty-
one percent of the land area in the tax bill. It is not the first
time that unexpected action of assessors may have altered
the expectations of parties under a tax escalator clause. See
*Winsor* v. *Ulin*, 223 Mass. 282, 283-284 (1916).

4. *Dean's right to recover tax payments already made.*
Dean paid the increased taxes claimed by "E" Street for
1969, 1970, and 1971 under protest. For the years 1972
through 1978, inclusive,[6] Dean paid the disputed amounts
into escrow in accordance with a stipulation filed in connec-
tion with this litigation. The complaint commencing the
action had been filed April 4, 1972. "E" Street contends
that Dean may not recover the payments made under pro-
test with respect to the 1969, 1970 and 1971 taxes because of
the familiar principle that a party who has paid a demand
voluntarily under a claim of right cannot recover his pay-
ments although he protests his liability at the time. *Rosen-
feld* v. *Boston Mut. Life Ins. Co.*, 222 Mass. 284, 289 (1915).
*Johnson* v. *Brockton*, 8 Mass. App. Ct. 80, 82 (1979). Cf.
*Campbell* v. *Boston*, 337 Mass. 676, 678 (1958).

The consequence for Dean of failure to pay the additional
taxes was, however, potentially grave. "E" Street might,
under Article XIV, Section 4, of the sublease, enter and eject
the tenant and the lease would be terminated. In those cir-
cumstances it could not be said that the payments were vol-
untary. The tenant was "not bound first to resort to litigation
in order to avoid the imputation of having paid voluntarily."
*Johnson* v. *Brockton, supra* at 83, quoting from *B & B
Amusement Enterprises, Inc.* v. *Boston*, 297 Mass. 307, 308
(1937). See also *Gold Medal Stamp Co.* v. *Carver*, 359
Mass. 681, 683-684 (1971), in which the plaintiff tenant paid
additional rent in accordance with a tax clause, under pro-

---

[6] Beginning 1974, the tax year in Massachusetts changed from the calen-
dar year to a fiscal year ending June 30. G. L. c. 44, § 56A, as amended
by St. 1969, c. 849, § 63, and St. 1971, c. 766, §§ 17 & 29.

test as to amount, for six years.  The plaintiff in *Gold Medal* was allowed to recover, although in that case the parties stipulated that the plaintiff was entitled to a rebate should its position be correct.

The judgment entered by the judge in accordance with his declaration of the rights of the parties is affirmed. Neither party shall have costs of the appeal.

*So ordered.*