In re BOLTON HALL NURSING HOME, INC., et al.

BROOKWOOD COURT NURSING HOME, Forest Manor Long-Term Care Facility, Lewis Bay Convalescent Home, Christian Hill Nursing Home, Stevens Hall Long-Term Care Facility, New Lenox Hall Limited Partnership, B & L Management Corporation d/b/a Columbus Nursing Home, Pioneer Valley Nursing Home Limited Partnership, Medico Associates, Inc., Bolton Hall Nursing Home, Inc., Bayhaven Nursing Home, Inc., Woodhaven Nursing Home, Inc., New Brookwood Court Nursing Home, Inc., New Forest Manor, Inc., New Lewis Bay, Inc., New Christian Hill, Inc., New Stevens Hall, Inc., New Lenox Hill Nursing and Rehabilitation Facility, New Columbus Nursing Home, Inc., New Pioneer Valley, Inc. and James M. Langan and Frederick G. Fisher, Jr., Surviving Trustees/Receivers, Plaintiffs,

v.

Thomas H. SPIRITO, as he is Commissioner of the Department of Public Welfare, Defendant.

Bankruptcy Nos. 76–1395–L, et al.

United States Bankruptcy Court, D. Massachusetts.

June 28, 1983.

Barry M. Portnoy and Peter A. Fine, Sullivan & Worcester, Boston, Mass., for debtors.

Robert Somma, Goldstein & Manello, Boston, Mass., for trustees/receivers.

William L. Pardee, Asst. Atty. Gen., for the Commonwealth of Mass.

## MEMORANDUM

THOMAS W. LAWLESS, Chief Judge.

### PARTIES

Plaintiffs James M. Langan and Frederick G. Fisher, Jr., are the duly appointed, qualified, and surviving trustees/receivers ("Trustees") of plaintiff Bolton Hall Nursing Home, Inc., ("Debtor"), debtor in a proceeding pending before the Court under Chapter XII of the Bankruptcy Act. The Trustees are also trustees/receivers of the other eleven plaintiffs herein ("Rehabilitated Debtors"), debtors in proceedings under Chapter XI and XII of the Act for which plans of arrangement have been confirmed ("Plans"). The remaining plaintiffs ("Successors") are the successors to the Rehabilitated Debtors. The Chapter XI and Chapter XII Proceedings of the Debtors and the Rehabilitated Debtors are hereinafter referred to as "the Proceedings."

Defendant Thomas H. Spirito is Commissioner of the Department of Public Welfare of the Commonwealth of Massachusetts ("Commonwealth").

### BACKGROUND

On May 26, 1976, the Debtors and the Rehabilitated Debtors filed original petitions under Chapter XI and XII of the Act. At present, plans of arrangement have been confirmed for all but one of the Debtors. On October 14, 1981, the plaintiffs in the above-entitled action filed a complaint against the Commissioner of the Department of Public Welfare, seeking monetary, declaratory and injunctive relief ("Complaint"). The essence of the dispute turns up on the operation of a regulation (the "offset regulation") in relation to the plaintiffs. The regulation provides that:

> If two or more facilities are or were under a common ownership, and if one or more of the facilities is owed money by

the Commonwealth, the Department may offset the provider's liability to the Department against the Department's liability to the provider. 106 C.M.R. 456.-703(E).

Each of the Debtor homes is reimbursed under a retrospective reimbursement system. In such a system, DPW advances funds to the home for current services based upon an interim, or estimated rate. At the end of the year, the home files a cost report which, after an audit, becomes the basis for the final rate for that year. *See* G.L. c. 6A, § 32. If the final rate is higher than the interim rate, DPW owes the difference, times total reimbursable patient days; if it is lower, the home owes the difference to DPW.

In March, 1981, the Rate Setting Commission established final rates for seven of the plaintiff homes which created an indebtedness to DPW in an amount totalling almost $96,000.00. About a month later, the Commission established final rates for three of the plaintiff homes (New Columbia, New Lenox Hill, New Stevens Hall) which created an indebtedness to them in an amount totalling nearly $65,000.00. The DPW offset one figure against the other, leaving a balance in favor of DPW of some $31,-000.00.

In their Complaint, plaintiffs challenge the Department's offset procedure, as applied to them, on three grounds. First, they assert that in earlier litigation between the parties, DPW stipulated that it would not resort to the offset procedure. Second, plaintiffs assert that each home is a legally individual entity, and that, though owned by New Medico Holding Co., Inc., they are not, as a matter of law, under a common ownership within the meaning of 106 C.M.R. 456.703(E). Third, they allege a catch-all claim that, in applying the offset procedure, DPW has violated the stipulation, its own regulations, the rights of secured creditors, and the "valid expectations" of unsecured creditors. Plaintiffs request that the Court declare the rights of the parties, not simply for the period during which any of the homes remain in proceed-

ings, but for all time, and that it permanently enjoin the Department from applying the offset regulation to the plaintiffs.

The defendant timely filed a motion to dismiss which identified three grounds upon which the complaint should be dismissed: lack of subject matter jurisdiction; sovereign immunity to a money judgment; and failure to state a claim upon which relief can be granted.

■ As a result of a pre-trial conference held on November 18, 1981, the Court, with the agreement of the parties, issued an Order dated December 11, 1981. In that Order, the Court directed that all offsets be reversed, with the sums owing by the respective parties thereto to be paid. As a result of the assented to Court Order, the Complaint no longer seeks a money judgment against the defendant. Although the defendant has not waived his claim of immunity under the Eleventh Amendment, there is no longer an occasion to consider it. Since the Complaint now seeks only declaratory and injunctive relief against the Commissioner, the action is not barred by the Eleventh Amendment. *E.g., Ex Parte Young,* 209 U.S. 123, 157–158, 28 S.Ct. 441, 452–453, 52 L.Ed. 714 (1908).

## DISCUSSION

The plaintiffs' first argument in support of their Complaint for declaratory and injunctive relief is that the defendant DPW stipulated in earlier litigation that it would not employ the offset procedure in relation to these homes. The stipulation in question was signed by the parties and approved by the Court on January 16, 1978 (the "Stipulation"). Paragraph 5 of the Stipulation, the interpretation of which is central to this case, states as follows:

5. With respect to any obligation to DPW and RSC which arose for any reason during the Proceedings, including any

1. This December 14, 1977 complaint deals with the respective rights of the (i) Trustees and the Debtor homes and the (ii) Commonwealth and the DPW on issues concerning (a) settlement and satisfaction and discharge of pre-petition indebtedness, (b) pre-petition overfinancing and (c) interest accrual during the Proceedings.

obligation to repay amounts by which interim rates paid to the Trustees exceed final rates for the period of the Proceedings, (i) such obligation will not be an obligation of the Trustees in their fiduciary or individual capacities, (ii) the Trustees are hereby released of all liability to RSC or DPW for such obligations, (iii) no administrative expense claim will be filed by RSC or DPW for such obligation and (iv) such obligation will become an obligation of the appropriate Massachusetts Home or its successor under a Plan of Arrangement confirmed in the Proceedings and DPW and RSC will look to the appropriate Massachusetts Home or its successor under Plans of Arrangement confirmed in the Proceedings for repayment of any such obligation.

The Stipulation arose between the parties as a result of the Commonwealth's objections to the confirmation of Plans of Arrangement for the Debtor homes, and of a complaint by the Trustees for declaratory and injunctive relief, which was filed on December 14, 1977.[1]

Plaintiffs assert that the Commonwealth's agreement that "it would look to the appropriate Massachusetts Home or its successor under Plans of Arrangement confirmed in the Proceedings for repayment" for any obligation owed to the Commonwealth which arose during the Proceedings, permits the Commonwealth to seek reimbursement only from the Rehabilitated Debtor in respect of which the obligation arose, or its Successor. The Commonwealth does not challenge the Court's authority in this Proceeding to interpret and enforce the Stipulation. The Commonwealth does assert, however, that the Stipulation was neither intended nor does in fact address the offset procedure.

The Commonwealth's objection to confirmation involved these three issues and a fourth issue concerning interest which would be reimbursed to the Massachusetts homes by DPW pursuant to rates established by the DPW after confirmation of Plans of Arrangement.

Stipulations, such as the instant one, are in the nature of contracts, and as such, ordinary principles of contract interpretation are applicable to the interpretation of a stipulation. *See United States v. ITT Continental Baking Co.,* 420 U.S. 223, 239, 95 S.Ct. 926, 936, 43 L.Ed.2d 148 (1975); *Eaton v. Courtaulds of North America, Inc.,* 578 F.2d 87, 90 (5th Cir.1978). The stipulation should be construed "in its natural sense," *United States v. ITT Continental Baking Co., supra,* 420 U.S. at 234, 95 S.Ct. at 933, and "where the wording of the contract is unambiguous, the contract must be enforced according to its terms." *Edmonds v. United States,* 642 F.2d 877, 881 (1st Cir. 1981); *Freelander v. G & K Realty Corp.,* 357 Mass. 512, 516, 258 N.E.2d 786 (1970). Principles of contract interpretation dictate that if there is a "plain, ordinary and proper meaning of a term," that is evidence of the parties' intent in using the term. *Jamesbury Corporation v. Worcester Valve Company,* 443 F.2d 205, 210 (1st Cir.1971).

Applying those standards herein, I find that the Commonwealth's express Stipulation that it would look only to the "appropriate Massachusetts home or its Successor", precludes the now assertion of a right of offset among the particular homes. The Stipulation expressly includes the obligation to repay overpayments among the obligations subject to its restrictions. The use of "Home" and "its successor" in the singular as well as the use of the word "the" as a preference to "appropriate Massachusetts Home," rather than "an" or "any," plainly indicates an intent to designate the specific home liable for the overpayment. If a contrary result had been intended, the Stipulation could have stated so without ambiguity.

The Stipulation, however, is expressly limited to obligations which arose *during the Proceedings* and was not intended to cover overpayments which arose subsequent to confirmation of Plans of Arrangement for the particular homes. Accordingly,

since the Stipulation does not prevent the Commonwealth from applying the offset regulation to overpayments made subsequent to confirmation, it is necessary to consider plaintiffs other arguments against the Commonwealth's application of the offset regulation.

Plaintiffs assert a variety of reasons why the offset regulation should not be applied to the reorganized Debtors for post-confirmation overpayments. They argue that each home is a legally individual entity and they are not, as a matter of law, under "common ownership" within the meaning of the offset regulation. Additionally, they argue that application of the offset regulation would do great damage to the rights of all parties as reflected in the confirmed Plans. In response, the Commonwealth argues that the application of the offset regulation is purely a question of state law, arises out of the ongoing relationship of the parties and, as such, the Commonwealth asserts that the Complaint should be dismissed for lack of jurisdiction or, in the alternative, that the Court should decline exercising its jurisdiction over this post-confirmation matter.

Treating the Commonwealth's motion to dismiss, I find that it should be allowed. Section 8.1 of the Confirmed Plans provides: "[The nursing home] will be subject to all proper laws and regulations of the United States and Massachusetts except as provided in Section 8.2." [2] Plaintiffs' assertion that the Commonwealth's post-confirmation application of the offset regulation would destroy the expectations of both secured and unsecured creditors under the Plans flies in the face of Debtors' acknowledgement in their Plans that it would comply with the Commonwealth's regulations. Indeed, Section 8.1 is very likely superfluous in that the Court could hardly sanction a contrary result. The whole purpose of reorganization is to rehabilitate the business and place it back in the mainstream of commerce, where the

**2.** As a result of Stipulation, ¶ 9, Section 8.2 contains no limitation on the applicability of state regulations to the Debtors.

770

reorganized entity can compete on an equal footing with like enterprises. Any attempt to afford special protections to the reorganized entity would not only be invalid but contrary to this public policy.

As to Plaintiffs' contention that the offset regulation is not a "proper" regulation in either principle or in its particular application to the Rehabilitated Homes, this is a matter to be addressed by the appropriate state court. Nothing in either the Plans, the prior Court orders entered in these protracted Proceedings or the Commonwealth's earlier consent to this Court's jurisdiction provides the Court with jurisdiction over this matter. To the extent that Plaintiffs believe otherwise, they need only consult the recent Fourth Circuit opinion in *In re 1616 Reminc Limited Partnership,* 704 F.2d 1313 (4th Cir.1983), where the court held that the ramifications of *Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* —— U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), extend to the Bankruptcy Act. Accordingly, the Commonwealth's Motion to Dismiss so much of the Plaintiffs' Complaint as it relates to the offset of post-confirmation overpayments is granted.

Parties are to settle and submit an appropriate Order in accordance with this Memorandum.